**Case Nos. 24-2107, 25-1060**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BROWN-FORMAN CORPORATION d/b/a
WOODFORD RESERVE DISTILLERY
*Petitioner/Cross-Respondent*

v.

NATIONAL LABOR RELATIONS BOARD
*Respondent/Cross-Petitioner*

---

On Petition for Review and Cross-Application for
Enforcement of a Decision and Order of the National Labor Relations Board
_____

### REPLY BRIEF OF PETITIONER/
### CROSS-RESPONDENT BROWN-FORMAN
### CORPORATION d/b/a WOODFORD RESERVE DISTILLERY

Oliver B. Rutherford
Jacob W. Crouse
Smith & Smith Attorneys
200 South Fifth Street
400 North, First Trust Centre
Louisville, Kentucky 40202
(502) 587-0761

*Counsel for Petitioner/Cross-Respondent Brown-Forman Corporation d/b/a Woodford Reserve Distillery*

# TABLE OF CONTENTS

TABLE OF CONTENTS ...................................................................... ii

TABLE OF AUTHORITIES ............................................................ iv

ARGUMENT ...................................................................................... 1

I. THE *LOPER BRIGHT* STANDARD OF REVIEW IS APPLICABLE TO THE BOARD'S CREATION OF ITS NEW STANDARD IN *CEMEX* .......................................................................................... 1

II. THE BOARD'S *CEMEX* DECISION CREATES AN UNLAWFUL STANDARD BY IMPOSING BARGAINING ORDERS AND PETITION FILING REQUIREMENTS ON EMPLOYERS CONFRONTED WITH UNION DEMANDS FOR RECOGNITION ............. 2

    A. The Board's New Legal Standard is Unauthorized by the NLRA and in Direct Contravention of United States Supreme Court Precedent. ............................................ 2

    B. The Board's *Cemex* Decision Ignores the Requirements of *Gissel*. ......................................................... 6

    C. *Cemex* is the Product of Unlawful Rulemaking in the Form of Adjudication. ............................................... 10

    D. The Board Erred in Retroactively Applying its New Standard in *Cemex* to this Matter. ........................................... 12

III. THE BOARD'S UNFAIR LABOR PRACTICE FINDINGS AND RULINGS ON OBJECTIONS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE OR ARE CONTRARY TO PRECEDENT .................................................................................. 15

    A. A Request for Recognition was Not Made to Brown-Forman until October 13, 2022 .............................................. 15

B.    There is an Absence of Evidence Regarding the
      Alleged Loss of Union Support ................................................ 16

C.    Woodford Reserve Management Made Clear to
      Employees that Entitlement to the October 2022
      Wage Increase was Not Tied to the Outcome of the
      Representation Election ........................................................... 18

D.    Woodford Reserve Management Informed Employees
      that their Right to Vote in Favor of Union
      Representation Would be Respected....................................... 19

E.    Wage Increases Were Provided to Employees Outside
      the Proposed Bargaining Unit ................................................ 20

F.    Captive Audience Meetings Conducted by Woodford
      Reserve Management were Lawful .......................................... 21

G.    The Board Misconstrues the Circumstances
      Surrounding the Distribution of a Bottle of Bourbon
      to Employees .......................................................................... 22

CONCLUSION ................................................................................ 24

CERTIFICATE OF COMPLIANCE................................................. 25

CERTIFICATE OF SERVICE ......................................................... 26

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Aaron Brothers,*
    158 N.L.R.B. 1077 (1966)................................................................7

*Amazon.com Servs. LLC,*
    373 N.L.R.B. No. 136 (2024)........................................................21

*Cemex Construction Materials Pacific, LLC,*
    372 N.L.R.B. No. 130 (2023)..............................................4, 5, 8, 9

*Central Distributing Co.,*
    187 N.L.R.B. 908 (1971)................................................................5

*Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.*
    467 U.S. 837 (1984) .....................................................................1

*Fibreboard Paper Prods. v. NLRB,*
    379 U.S. 203 (1964)..................................................................2, 6

*Ford Motor Co. v. F.T.C.,*
    673 F.2d 1008 (9th Cir. 1981) .....................................................11

*Ford Motor Co. v. NLRB,*
    441 U.S. 488 (1979)......................................................................6

*Gibson Prods. Co. of Wash. Parish,*
    185 N.L.R.B. 362 (1970)................................................................8

*Gissel Packing Co.,*
    157 N.L.R.B. 1065 (1966)..............................................................7

*Joy Silk Mills,*
    85 N.L.R.B. 1263 (1949)................................................................8

*Linden Lumber,*
    190 N.L.R.B. 718 (1971)..............................................................12

*Linden Lumber Div. v. NLRB,*
   419 U.S. 301 (1974)...................................................................................3, 12

*Local 900, Intern. Union of Elec., Radio and Mach. Workers v. NLRB,*
   727 F.2d 1184 (D.C. Cir. 1984)......................................................................14

*Longshoremen & Warehousemen Local 6 (Sunset Line & Twine Co.),*
   79 N.L.R.B. 1487 (1948).................................................................................5

*Loper Bright Enterprises v. Raimondo,*
   603 U.S. 369 (2024)...................................................................................1, 2

*Mediplex of Conn.,*
   319 N.L.R.B. 281 (1995) ...............................................................................22

*NLRB v. Bell Aerospace Co. Div. of Textron, Inc.,*
   416 U.S. 267 (1974) ........................................................................10, 11, 13

*NLRB v. Gissel Packing Co.,*
   395 U.S. 575 (1969) ........................................................................3, 7, 8, 13

*NLRB v. I.N.S.A., Inc.,*
   Case 1:23-cv-12368-MJJ (D. Mass., May 14, 2024). ...................................14

*NLRB v. Majestic Weaving Co.,*
   355 F.2d 854 (2d Cir. 1966) ..........................................................................11

*NLRB v. Overseas Motors, Inc.,*
   818 F.2d 517 (6th Cir. 1987) ...........................................................................2

*NLRB v. ProMedica Health Sys.,*
   206 F. App'x 405 (6th Cir. 2006)...................................................................19

*NLRB v. Wyman-Gordon Co.,*
   394 U.S. 759 (1969).......................................................................................11

*NVE Constructors, Inc. v. NLRB,*
   934 F.2d 1084 (9th Cir. 1991) .........................................................................3

*Retail, Wholesale & Dep't Store Union v. NLRB,*
    466 F.2d 380 (D.C. Cir. 1972)........................................................................14

*Sandusky Mall Co. v. NLRB,*
    242 F.3d 682 (6th Cir. 2001) ...................................................................2, 6

*SEC v. Chenery Corp.,*
    332 U.S. 194 (1947) ...........................................................................11, 14

*Skyline Distributors v. NLRB,*
    99 F.3d 403 (D.C. Cir. 1996)........................................................................18

*Taylor v. Buchanan,*
    4 F.4th 406 (6th Cir. 2021) ...................................................................2, 6

## **Statutes**

5 U.S.C. § 553 ...............................................................................................11

29 U.S.C. § 156...............................................................................................8

29 U.S.C. § 157...............................................................................................4

29 U.S.C. § 160(j) ...........................................................................................13

# ARGUMENT

## I.  THE *LOPER BRIGHT* STANDARD OF REVIEW IS APPLICABLE TO THE BOARD'S CREATION OF ITS NEW STANDARD IN *CEMEX*.

The Board and Intervenor assert that the Supreme Court's decision in *Loper Bright* has no practical impact on the standard of review in this case in light of preexisting precedent.  (Bd.-Br. 18-19; I.-Br. 18-22).[1]  But their argument ignores the reality that a central issue in this appeal is whether the Board exceeded its own authority under the Act in issuing its decision in *Cemex* and, in *Loper Bright*, the Supreme Court held that a reviewing court must not defer to the Board's interpretation of the NLRA but must now "exercise [its] independent judgment in deciding whether an agency has acted within its statutory authority[.]" *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369, 412 (2024).

Further, the Supreme Court determined that deference to agency determinations under *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.* 467 U.S. 837 (1984) is particularly inappropriate where the scope of an agency's authority to act is at issue, as it is here.  The Court in *Loper Bright* stated that, "The very point of the traditional tools of statutory construction -- the tools courts use every day -- is to resolve statutory ambiguities.  That is no less true when the ambiguity is about the scope of an agency's own power -- perhaps the occasion on which abdication in favor

---

[1] In this brief, "Appx." refers to the appendix filed with the Court. "Bd.-Br." refers to the opening brief of the National Labor Relations Board; "I.-Br." refers to the brief of Intervenor.

of the agency is *least* appropriate." *Id.* at 401. *Loper Bright* is squarely applicable here.

The viability of the Board's action in *Cemex* turns, in part, on whether it acted in contravention of Supreme Court precedent in issuing its decision. Even were *Loper Bright* inapplicable here, however, this Court's precedent holds that when reviewing the Board's interpretation of Supreme Court precedent, this Court does not lend deference to the Board's decision making. *Taylor v. Buchanan*, 4 F.4th 406, 408 (6th Cir. 2021); *Sandusky Mall Co. v. NLRB*, 242 F.3d 682, 692 (6th Cir. 2001). The Board is not entitled to deference under either *Loper Bright* or this Court's existing precedent.

## II. THE BOARD'S *CEMEX* DECISION CREATES AN UNLAWFUL STANDARD BY IMPOSING BARGAINING ORDERS AND PETITION FILING REQUIREMENTS ON EMPLOYERS CONFRONTED WITH UNION DEMANDS FOR RECOGNITION.

### A. The Board's New Legal Standard is Unauthorized by the NLRA and in Direct Contravention of United States Supreme Court Precedent.

The Board acknowledges that its choice of remedies will fail when that choice is shown to be "a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act," citing *Fibreboard Paper Prods. v. NLRB*, 379 U.S. 203, 215-16 (1964) (Bd.-Br. 38); *see also NLRB v. Overseas Motors, Inc.*, 818 F.2d 517, 520 (6th Cir. 1987). The Board's *Cemex* decision ignores the legislative history of the Act and the will of Congress as recognized by the Supreme Court. In so doing, the Board plainly attempts to minimize secret ballot elections in favor of card check authorizations for ascertaining whether a union has majority support and

improperly places the burden on employers to file election petitions with the Board. The Board's *Cemex* decision represents an attempted "end-run" around multiple failed legislative efforts to relegate secret ballot elections in favor of card check authorization as the preferred form of union recognition.

The Act was amended in 1959 to clearly demonstrate Congress's preference for secret ballot elections that are conducted by the NLRB. Section 8(b)(7)(C) of the Act was added to promote "prompt resort to the Board's election machinery, rather than protracted picketing, as the method for resolving questions concerning representation." *NVE Constructors, Inc. v. NLRB*, 934 F.2d 1084, 1090 (9th Cir. 1991). Consistent with the 1959 amendments, the Supreme Court recognized that "a union with authorization cards purporting to represent a majority of the employees, which is refused recognition, has the burden of taking the next step in invoking the Board's election procedure." *Linden Lumber Div. v. NLRB*, 419 U.S. 301, 310 (1974). The Supreme Court could find nothing in the Act to suggest Congress intended to place the burden of filing an election petition on employers: "[t]here is no suggestion that Congress wanted to place the burden of getting a secret election on the employer." *Id.* at 307.

*Cemex*, however, ignores and avoids each of these policy choices made by Congress and recognized by the Supreme Court. *Cemex* relegates secret ballot elections to be an exception to assessing a union's majority status, not the preferred method, contrary to the Supreme Court's *Gissel* decision. *NLRB v. Gissel Packing Co.*, 395 U.S. 575, 602-03 (1969) (finding authorization cards to be "admittedly

3

inferior to the election process" and affirming the principle that "secret ballot elections are generally the most satisfactory – indeed the preferred – method of ascertaining whether a union has majority support").[2]

*Cemex* also places the burden on the employer, not the union, to file an election petition, in direct contravention of the Supreme Court's decision in *Linden Lumber*. The Board and Intervenor assert, simply because an employer can still file an election petition, that secret ballot elections remain the preferred method of ascertaining a union's majority standing post-*Cemex*. (Bd.-Br. 49-50; I.-Br. 59). But their argument ignores the reality that the process for employer-initiated election petitions has become far more complex and nuanced under *Cemex* and pushes union organizing squarely to the side of favoring card check authorizations.

This is so because *Cemex* directs that any such petition must be filed within two weeks of a union's declaration of majority standing. *Cemex Construction Materials Pacific, LLC*, 372 N.L.R.B. No. 130 at 25, n. 139 (2023) ("we will normally interpret 'promptly' to require an employer to file its RM petition within 2 weeks of the union's demand for recognition"). And to further complicate the process, this two-week period can be triggered by a union simply making a verbal statement that does not even have

---

[2]    The Board's purported justification that *Cemex* "better protects the right of employees to designate a representative in a timely manner" (Bd.-Br. 43) wholly ignores the reality that the primary concern of the NLRA is not the rapidity with which a group of employees may select union representation, but to ensure employees can fairly choose, *or decline to choose*, union representation. 29 U.S.C. § 157.

to be made upon any particular officer or agent of an employer, so long as the person is "acting as an agent of an employer" under the Act. *Longshoremen & Warehousemen Local 6 (Sunset Line & Twine Co.)*, 79 N.L.R.B. 1487, 1509 (1948); *Central Distributing Co.*, 187 N.L.R.B. 908, 915 (1971) (finding demand for recognition and bargaining on warehouse manager valid despite claim he was not authorized to act on behalf of company). And should an employer fail to file its petition within the two-week period, the Board will declare the union to have majority standing and issue a "remedial" bargaining order. *Cemex*, 372 N.L.R.B. No. 130 at 26, n. 141. The Board and Intervenor's claim that secret ballot elections remain preferred under *Cemex* simply does not hold water.

Numerous efforts have been made in Congress since the Act was amended in 1959 to pass legislation that would make authorization card check a mandatory form of union recognition by employers. The Employee Free Choice Act was introduced in Congress in various forms through multiple bills from 2003 to 2009, along with the Workplace Democracy Act in 2015, and reintroduced in 2016. The Protecting the Right to Organize Act was introduced in 2019, 2021 and again in 2023 to no avail. None of these efforts to relegate secret ballot elections in favor of authorization card check recognition were successful. Congress, by its failure to enact these legislative efforts, soundly rejected the policy choices embodied therein. The *Cemex* majority, however, simply ignored these policy rejections when it reversed its *Linden Lumber* decision.

5

In this light, *Cemex* ignores the policy choices made by Congress and represents a transparent, and unlawful, effort by the Board to side-step those choices and substitute its own policy for that of Congress. *Cemex* presents a textbook example of the Board's attempt "to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Fireboard Paper*, 379 U.S. at 215-16. But the Board is not authorized to create policy that is "fundamentally inconsistent with the structure of the Act" and an attempt to "usurp major policy decisions properly made by Congress." *Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979). Because the Board in *Cemex* purposefully and openly ignores over a half-century of precedent in fashioning an overhaul of how private sector employees can unionize, the Court should set aside and decline to enforce the Board's Order.

**B.    The Board's *Cemex* Decision Ignores the Requirements of *Gissel*.**

The Board accuses Brown-Forman and Amici of "misrepresent[ing]" the Supreme Court's holding in *Gissel* by stating that *Cemex* contravenes *Gissel* and lowers the threshold for issuing a bargaining order. (Bd.-Br. 47-48). In particular, the Board states that *Gissel* merely "affirmed the Board's proposed criteria for when to issue bargaining orders." (Bd.-Br. 48).[3] Intervenor's response follows suit with the Board. (I.-Br. 59-60). A close review of *Gissel's* history, however, confirms that it was the Supreme Court in *Gissel*, not the Board, who adopted and codified the standard

---

[3]    Notably, the Board's interpretation of Supreme Court precedent receives no deference. *Taylor*, 4 F.4th at 408; *Sandusky Mall Co.*, 242 F.3d at 692.

by which the Board's exercise of remedial bargaining order authority would be measured.

First, the Board's decision in the originating *Gissel* case did not discuss a standard under which an assessment would be made whether a fair rerun election could be held when deciding if a bargaining order is appropriate. *Gissel Packing Co.*, 157 N.L.R.B. 1065 (1966). There was simply no mention of a standard under which an assessment of the propriety of a rerun election would be made before a bargaining order issued in that case.

Second, the Board's briefing before the Supreme Court in *Gissel* followed the approach in *Aaron Brothers*, 158 N.L.R.B. 1077 (1966) which stated: 1) the General Counsel must show bad faith on the part of the employer in refusing to recognize a union; and 2) an employer would not be held to have violated a bargaining obligation simply because it refused to rely upon authorization cards for determining a union's majority status. *Gissel*, 395 U.S. at 566-67. Again, the Board's briefing made no mention of utilizing a standard under which an assessment whether a fair rerun election could be held must be made before a bargaining order could be issued.

Apparently during oral argument before the Supreme Court in *Gissel*, Board counsel announced that the "current practice" of the Board was to no longer focus on an employer's good faith doubt as to a union's majority status, as it did under *Joy Silk*, but to focus, instead, on whether the employer committed "serious unfair labor practices that interfere with the election processes and tend to preclude the holding of

7

a fair election." *Gissel*, 395 U.S. at 594; *Joy Silk Mills*, 85 N.L.R.B. 1263 (1949). This "current practice" of the Board was neither the product of Board adjudication, nor the product of its rulemaking authority under 29 U.S.C. § 156. The *Gissel* Court was left to set the standard.

> *Cemex* acknowledges that *Gissel* holds as follows:
>
> [W]here a union has at some point achieved majority support and a respondent has engaged in unfair labor practices which "have the tendency to undermine majority strength and impede the election process," the Board "should issue" an order for the respondent to bargain with the union without an election if "the Board finds that the possibility of erasing the effects of past practices and of ensuring a fair election (or a fair rerun) by the use of traditional remedies, though present, is slight and that employee sentiment once expressed through cards would, on balance, be better protected by a bargaining order.

*Cemex*, 372 No. 130, at 12. Of significance here is the express recognition by the *Cemex* Board that this standard is in fact the holding of *Gissel* (e.g., "The Supreme Court held in *Gissel* that, where a union has …."). *Id.* The *Cemex* Board itself recognized that the *Gissel* standard has been followed by the Board and reviewing courts for the last fifty plus years. And Board cases subsequent to the Supreme Court's decision in *Gissel* also recognized that it was the Court that set the standard announced therein. *See Gibson Prods. Co. of Wash. Parish*, 185 N.L.R.B. 362 (1970) ("On June 16, 1969, the Supreme Court of the United States issued its opinion in *N.L.R.B. v. Gissel Packing Company*, in which *it* laid down certain guidelines relating to the finding of violations of Section 8(a)(5) and to the issuance of bargaining orders based upon such violations and upon violations of other sections of the Act. . . .") (emphasis

added).   To suggest that statements made by Board counsel during oral argument can create the legal standard by which the Board's remedial bargaining order authority is to be assessed, rather than through Board adjudication or rulemaking, strains credulity.

Rather than honoring the Supreme Court's pronouncement in *Gissel*, the *Cemex* Board, however, simply ignores the analysis of whether a rerun election is possible, stating instead "we do not believe that conducting a *new* election . . . can ever be a truly adequate remedy."  372 N.L.R.B. No. 130, at 26 (italics in original). This position wholly ignores the mandate of *Gissel*.

The Board's assertion that Brown-Forman and Amici "misrepresent" the *Gissel* opinion by stating that it lowers the threshold for issuing bargaining orders fares no better.  The standard in *Cemex* deviates significantly from *Gissel* and, contrary to the argument of the Board and Intervenor (I.-Br. 61-62), in fact lowers the threshold for issuing bargaining orders by ignoring the viability of a rerun election and stating that a bargaining order will issue for any unfair labor practice "that requires setting aside the election."  *Cemex*, 372 N.L.R.B. No. 130, at 26.

When assessing whether an unfair labor practice requires an election to be set aside under *Cemex*, the Board directs that violations occurring in the run-up to the election will result in the setting aside of the election unless the "violations . . . are so minimal or isolated that it is *virtually impossible* to conclude that the misconduct could have affected the election results."   *Cemex*, 372 N.L.R.B. No. 130, at 26, n. 142 (citations omitted).  This extraordinarily high standard for employers to meet means

that the occurrence of a single unfair labor practice, no matter how minor or technical, in the lead up to the election will result in the issuance of a bargaining order. This outcome effectively overrules *Gissel* and lowers the standard for issuing bargaining orders because it: 1) entirely disregards whether traditional remedies or changed circumstances might justify ordering a rerun election; and 2) makes finding a violation in the run-up to an election an extraordinarily facile exercise. Here again, the Board cannot overrule Supreme Court precedent by substituting its interpretation of the NLRA for that of the Court.

### C.  *Cemex* is the Product of Unlawful Rulemaking in the Form of Adjudication.

The Board responds to Brown-Forman's argument that *Cemex* represents improper rulemaking in the form of adjudication by stating that "the choice between rulemaking and adjudication lies in the first instance within the Board's discretion." *NLRB v. Bell Aerospace Co. Div. of Textron, Inc.*, 416 U.S. 267, 293-94 (1974); (Bd.-Br. 53). But the Board fails to offer any meaningful explanation why rulemaking was inappropriate in the context of *Cemex*. The Board and Intervenor also claim the Supreme Court permitted the Board to engage in such adjudication, rather than rulemaking, in *Linden Lumber* and *Gissel*. (Bd.-Br. 53; I.-Br. 63). But those opinions do not reflect that there was a challenge to the Board's use of adjudication rather than rulemaking, as there is here. Further, *Cemex*, unlike *Gissel* and *Linden Lumber*, announced a sweeping change to the union election process with a far-reaching impact

10

upon workforces across the country – a dynamic which favors rulemaking through a deliberative process over adjudication. *NLRB v. Wyman-Gordon Co.*, 394 U.S. 759, 764-65 (1969).

The Board and Intervenor's assertions ignore the guidelines set by the Supreme Court for such rulemaking. In *SEC v. Chenery Corp*, the Supreme Court opined that since an administrative agency has the ability to make new law prospectively through the exercise of its rulemaking powers, it has less reason (than a court) to rely upon *ad hoc* adjudication to formulate new standards of conduct. 332 U.S. 194, 202 (1947); *NLRB v. Majestic Weaving Co.*, 355 F.2d 854, 860 (2d Cir. 1966). The Board has been sharply criticized for largely ignoring its rulemaking authority, as it did here, in favor of case-by-case adjudication. *Wyman-Gordon Co.*, 394 U.S. at 764 (rulemaking authority was "designed to assure fairness and mature consideration of rules of general application").

*Cemex* affects private employers and employees across the United States by drastically changing the method by which union representation is determined. Where an agency desires to change the law and establish rules having widespread application, it must do so through rulemaking. *Bell Aerospace*, 416 U.S. at 293-94 (rulemaking required where issue at hand is not difficult to predict or resolve through application of a general rule); *Ford Motor Co. v. F.T.C.*, 673 F.2d 1008, 1009 (9th Cir. 1981). Such rulemaking requires publication of the rule and affords affected parties an opportunity for notice and comment. 5 U.S.C. § 553; W*yman-Gordon Co.*, 394 U.S. at 764.

The Board was required to utilize the rulemaking process, including notice-and-comment, in adopting its new standard and its failure to do so is violative of its statutory authority.

### D.    The Board Erred in Retroactively Applying its New Standard in *Cemex* to this Matter.

The Board asserts that Brown-Forman is unable to show "justifiable reliance" on the long-standing and overruled precedent in *Linden Lumber* such that retroactive application of *Cemex* is unwarranted.  (Bd.-Br. 54-55).  The Board's argument, however, ignores the reality that the law as of October 2022, which had been in effect for over fifty years at that point, afforded Brown-Forman the right to not voluntarily recognize the Union when it made its claim of majority standing among the Company's employees.  *Linden Lumber*, 190 N.L.R.B. 718 (1971); *Linden Lumber Div. v. NLRB,* 419 U.S. 301 (1974).  Brown-Forman was privileged under Board law and Supreme Court precedent to test the Union's claim of majority status through the Board's election process, which the Union already had triggered through the filing of its RC petition at the time it claimed majority support, without fear of being charged with failing to bargain with the Union under Section 8(a)(5) of the Act.  (A.191; A.100-18, A.291-327, 425-27).

Instead, with retroactive application of *Cemex*, the Board found that Brown-Forman violated 8(a)(5) through the legal fiction that it had "refused to bargain" with the Union at a time when it was under no obligation to do so and the Union already

had filed an election petition. Rather than voluntarily recognizing the Union, Brown-Forman entered into a Stipulated Election Agreement with the Union to allow the Board's election machinery to determine majority support. These facts aptly demonstrate Brown-Forman's justifiable reliance on existing precedent.

The Board next asserts that the *Cemex* order here is not predicated on Brown-Forman's "hypothetical reliance" on the *Linden Lumber* standard. (Bd.-Br. 55). This argument ignores the reality, however, that the *Cemex* order is predicated upon the legal fiction that Brown-Forman refused to bargain with the Union under Section 8(a)(5). In this regard, the Board did in fact impose "new liability . . . for past actions which were taken in good-faith reliance" on overruled precedent. *Bell Aerospace Co.*, 416 U.S. at 295.

The Board also asserts that failing to apply *Cemex* retroactively would allow companies such as Brown-Forman to act with impunity. (Bd.-Br. 55). Not so. The Board still has the remedial power of *Gissel* at its disposal, with the backing of the Supreme Court, which carries with it the power to order a company to bargain with a union or to order a rerun election if the circumstances warrant. *Gissel*, 395 U.S. at 614-15. Further, the Board continues to have the powerful remedy of a Section 10(j) injunction at its disposable, 29 U.S.C. § 160(j), a remedy which the Board continues to seek and openly describes as an "effective enforcement tool," despite its current

13

attempt to downplay its efficacy (Bd.-Br. 47, n.15).[4]

Retroactive application of *Cemex* in the instant case is particularly inappropriate because, unlike the situation in *Chenery Corp.*, 332 U.S. at 202-03 (approving retroactive application of new Board precedent on a novel issue), the instant case does not involve an issue novel to the Board.  Nor does the instant case involve the absence of a previous standard such that the Board's duty to exercise its function of "filling in the interstices of the Act" is implicated.  *Chenery Corp.*, 332 U.S. at 202-03.  Rather, the *Linden Lumber* standard to which the Company conformed its conduct was well established and had been accepted by the Board for over fifty years.  The Board in *Linden Lumber* established an explicit standard of conduct and "now attempts to punish conformity to that standard under a new standard subsequently adopted." *Retail, Wholesale & Dep't Store Union v. NLRB*, 466 F.2d 380, 391 (D.C. Cir. 1972). *Cemex* represents "an abrupt departure from well-established practice" in *Linden Lumber* which militates against its retroactive application.  *Local 900, Intern. Union of Elec., Radio and Mach. Workers v. NLRB,* 727 F.2d 1184, 1195 (D.C. Cir. 1984). The Board's *Cemex* decision should not have been applied retroactively.

---

[4]   https://www.nlrb.gov/what-we-do/investigate-charges/10j-injunctions;  *NLRB v. I.N.S.A., Inc.*, Case 1:23-cv-12368-MJJ (D. Mass., May 14, 2024).

### III. THE BOARD'S UNFAIR LABOR PRACTICE FINDINGS AND RULINGS ON OBJECTIONS ARE NOT SUPPORTED BY SUBSTANTIAL EVIDENCE OR ARE CONTRARY TO PRECEDENT.

The Board erred in finding that Woodford Reserve unlawfully announced and granted improved benefits to production employees prior to a demand for recognition or the filing of a representation petition by the Union to dissuade employees at Woodford Reserve from supporting the Union. *Brown-Forman Corp.*, 373 N.L.R.B. No. 145 (2024) (Appx. 0184-0185).

### A. REQUEST FOR RECOGNITION WAS NOT MADE TO BROWN-FORMAN UNTIL OCTOBER 13, 2022.

Both the Board and the Intervenor state that "the Union" sent a letter to Nelson on August 25, 2022, informing Woodford Reserve that an organizing campaign had been initiated. (Bd.-Br. 7; I.-Br. 4-5). To be clear, that letter stated that it had been sent by the "Woodford Reserve Distillery Organizing Committee," an anonymous group of Woodford Reserve employees *not* by Teamsters Local 651. (Appx. 328). In that letter, the "committee" stated that it had "begun organizing a union with Teamsters Local 651" and requested that Woodford Reserve "remain neutral." (*Id*.). There was no request that Woodford Reserve recognize the Union as the bargaining representative for Woodford Reserve employees. (*Id*.). The letter did not identify which groups of employees or employee positions were targeted in the organizing campaign. (*Id*.). A request for recognition from the Union was not received by Woodford Reserve until October 13, 2022. (Appx. 0100-0118).

15

### B. THERE IS AN ABSENCE OF EVIDENCE REGARDING THE ALLEGED LOSS OF UNION SUPPORT.

The Board argues that Brown-Forman "shows no error by arguing that the wage increase did not diminish union support." (Bd.-Br. 30). That position ignores the obvious impact that hearing testimony on the alleged undermining of support for the Union by Brown-Forman had on the decision of the Administrative Law Judge ("ALJ") that a bargaining order was appropriate (a decision subsequently upheld by the Board), particularly his finding that Brown-Forman had committed "serious violations" of the National Labor Relations Act:

> Here, Respondent committed hallmark violations requiring the election be set aside with the wage increase . . . directly affected most-if-not-all the employees in the petitioned-for unit . . . The increase and policy changes had the desired effect because interest in the campaign plummeted immediately after they were announced.

(Appx. 198). The ALJ then went on to cite the infirm testimony of Board witnesses regarding employees who supposedly expressed their loss of support for the union organizing campaign, testimony rehashed by both the Board and Intervenor. (Bd.-Br. 12; I.-Br. 10-11).

Woodford Reserve employees Mason Hudson, Matthew Hernandez, and Hannah Hernandez simply repeated statements allegedly made to them by other Woodford Reserve employees who no longer support the organizing campaign or, in an even more tenuous connection, repeated statements that Union Organizer Joe Bill Lance told them that other Woodford Reserve employees had told him. (Appx. 5-6,

11-12, 192, 334-35, 439, 448).[5]  For example, Matthew Hernandez testified that Lance

told him that Moore told Lance in a text message (a text message that Lance was unable

to produce at the hearing) that he was taking "the bribe."

> A. Yes, sir. Josh Moore.
>
> [. . .]
>
> Q. How did he drop out?
>
> A. I was informed by Joe Lance that he's taken the bribe and
> he's out.

(Appx. 5-6, 334, 448).

None of the Woodford Reserve employees who allegedly made statements that

they no longer supported the Union after the October 2022 wage increase were

subpoenaed to testify by either the Board or the Intervenor.  There is a dearth of

competent evidence supporting the testimony regarding a loss of support for the Union.

While having an obvious, persuasive impact on the ALJ, that testimony amounted to

little more than individuals who were dissatisfied with the outcome of the

representative election taking the opportunity to disparage Woodford Reserve.

Whether the Union experienced a loss of support as a result of the grant of

benefits by Brown-Forman also factors into whether the issuance of a bargaining order

---

[5] Appendix Pages 448-450 are included in the Supplemental Appendix of Petitioner/Cross-Respondent Brown-Forman filed contemporaneously with its pending unopposed Motion for Leave to Supplement the Appendix of Brown-Forman. (RE 48).

is appropriate or whether a less extreme remedy should be ordered, such as a rerun election. Both the Board and Intervenor argue at length that support for the Union has been permanently undermined. (B.-Br. 57-58; I.-Br. 54-55). The alleged loss of support was overstated and extrapolated from secondhand, hearsay statements.

### C. WOODFORD RESERVE MANAGEMENT MADE CLEAR TO EMPLOYEES THAT ENTITLEMENT TO THE OCTOBER 2022 WAGE INCREASE WAS NOT TIED TO THE OUTCOME OF THE REPRESENTATION ELECTION.

Woodford Reserve employees were clearly informed by multiple management representatives that the October 2022 wage increase was permanent and would not be impacted in any way by the outcome of the representation election. (Appx. 17-19). In communicating that message to employees, Brown-Forman management created an intentional disconnect between the implementation of the October 2022 wage increase, to address recruiting and retention issues, and the outcome of the election.

The Company made obvious to employees who were inclined to be represented by the Union that they could "have their cake and eat it too" – accept the October 2022 wage increase and vote in favor of Union representation. *See Skyline Distributors v. NLRB*, 99 F.3d 403, 409 (D.C. Cir. 1996) ("Although the promise by an employer to grant some special benefit in the event the union is defeated . . . has coercive implications, it is not at all clear that the same is true when the employer actually grants benefits during the course of an election campaign . . . .") (internal citation omitted). The subsequent vote of Woodford Reserve employees against representation by the Union should be respected, not undermined by the imposition of a bargaining order.

### D.   WOODFORD RESERVE MANAGEMENT INFORMED EMPLOYEES THAT THEIR RIGHT TO VOTE IN FAVOR OF UNION REPRESENTATION WOULD BE RESPECTED.

An employer violates Section 8(a)(1) if, considering the totality of the circumstances, the employer's actions had a "reasonable tendency" to interfere or coerce.  In evaluating those circumstances, both the ALJ and the Board failed to give sufficient weight to, or entirely ignored, statements made by Brown-Forman management representatives that there would be no negative consequences for employees regardless of the outcome of the election.  *See e.g. NLRB v. ProMedica Health Sys.*, 206 F. App'x 405, 415 (6th Cir. 2006) (declining to find a Section 8(a)(1) violation where employer expressed desire to raise wages regardless of the electoral outcome).

When Nelson met with employees on September 16, 2022, he made repeated statements to employees during his presentation that both he and Woodford Reserve would respect employees' right to their own respective opinions regarding union representation:  "And - and if you have a different opinion, no big deal, no hard feelings, I'm not, I'm not angry, not mad, not upset, like, and I want you all to see that"; "I mean you can have a different opinion than me and that's no big deal - continue to get along, I hope"; "You should do what you think is best"; and "But I would invite you to - to be open minded with what I say but also and - and if you know - quest -, you know my opinions are my opinions, and it's OK to – to have different

19

ones." (Appx. 336). The ALJ ignored this aspect of Nelson's presentation and selectively chose, instead, to incorporate a very narrow slice of Nelson's presentation to the employees in his findings. From there, the ALJ recast Nelson's isolated statement that "Respondent would not stand idly by in response to the organizing campaign" as an out-of-context sinister threat to the employees, instead of the lawful statement it was. (Appx. 227).

The actions of Brown-Forman thereafter confirmed the veracity of Nelson's statements to the employees. At no point during the union organizing campaign, or in the months after the representation election, did Brown-Forman discipline employees for their involvement in the organizing campaign, terminate the employment of employees for their involvement in the organizing campaign, interrogate employees for their involvement in the organizing campaign, surveil employees for their involvement in the organizing campaign, or take any other adverse employment action against employees for their involvement in the organizing campaign. In fact, Brown-Forman did not take any steps to identify whether specific employees were active in the organizing campaign at any point.

### E.    WAGE INCREASES WERE PROVIDED TO EMPLOYEES OUTSIDE THE PROPOSED BARGAINING UNIT.

At the same time Nall approved the October 2022 wage increase for Woodford Reserve employees, he also approved a $2.00 per hour increase for all employees at Old Forester Distilling Co., a separate non-union Brown-Forman distillery located in

Kentucky ("Old Forester"), because the wage rates there were found to be below regional wage rates, as were those at Woodford Reserve. (Appx. 0080). Both the wage increase for Woodford Reserve employees and the wage increase for Old Forester employees were permanent increases which remain in place in both facilities, a fact which mitigates against the ALJ's finding that the wage increase at Woodford Reserve was implemented for the purpose of impacting the representation election.

### F.  CAPTIVE AUDIENCE MEETINGS CONDUCTED BY WOODFORD RESERVE MANAGEMENT WERE LAWFUL.

Intervenor makes reference to "antiunion captive audience meetings" conducted by Brown-Forman management. (I.-Br. 8). To be clear, at the time Brown-Forman management met with Woodford Reserve employees to communicate the Company's position regarding union representation, in September and October 2022, there was no prohibition against an employer conducting so-called "captive audience" meetings. (Appx. 140, 145, 336, 342). While the Board radically changed its position regarding such meetings, upending over 75 years of consistent Board policy, in November 2024, that decision did not apply retroactively. *Amazon.com Servs. LLC*, 373 N.L.R.B. No. 136 (2024).[6] Further, no unfair labor practice charges were pursued by the Board against Brown-Forman for the statements made by Brown-Forman management at

---

[6] As Member Kaplan points out in his dissent in *Amazon.com Servs. LLC*, this is yet another example of the Board taking a "momentous step without first issuing a notice and invitation to file briefs so that interested amici could present their views . . . the majority's failure to allow public briefing is indefensible." 373 N.L.R.B. No. 136 at *115.

those employee meetings, nor should there have been, as those communications were entirely lawful. *Mediplex of Conn.*, 319 N.L.R.B. 281 (1995).

### G.   THE BOARD MISCONSTRUES THE CIRCUMSTANCES SURROUNDING THE DISTRIBUTION OF A BOTTLE OF BOURBON TO EMPLOYEES.

Woodford Reserve challenges the Board determination that the routine gift of a 375 ml bottle of bourbon, with a retail value of approximately $30.00, in November 2022, to all Woodford Reserve employees constituted a violation of the NLRA.  In its brief, the Board attempts to bolster that position by terming the provision of that bottle of bourbon an "unprecedented, all-employee gift" intended to by Woodford Reserve to manipulate the outcome the representation election.  (Bd.-Br. at 34-35).  That assertion is factually incorrect as Woodford Reserve had gifted bottles of bourbon to all of its employees on multiple occasions (as testified to by Thomas Reid, Production Manager of Bottling Operations – Appx. 63), had gifted bottles of bourbon for the achievement of operational equipment effectiveness (OEE) records in the past (August 2002; RX 4 at Appx. 0119-0123 and as confirmed by Hannah Hernandez, Appx. 449), and had gifted larger bottles of bourbon of greater monetary value in the past (750 ml Derby bottle signed by Master Distiller in April 2022; RX 4 at Appx. 0119-0123).

The Board also repeats the same unsupported assertion made by ALJ that Woodford Reserve had a practice of encouraging employee productivity by informing employees "in advance" or "previously announc[ing]" that employees would be rewarded for their efforts with the distribution of a gift of a bottle of bourbon.  (B.-Br.

46).  Neither the Board nor the ALJ cite to any evidence in the record to support that claim.  In fact, Reid testified that the opposite was true when it came to the practice of distributing bottles of bourbon to Woodford Reserve employees – a record was first achieved by employees and the announcement of a bottle of bourbon being distributed was made after that achievement was reached:

> Q. So what happened first? The decision to give the employees in 2018 a 375 double oaked bottle or the bottling employees broke the 49.2 percent OEE record? What would have happened first in time?
>
> A. They would have broken the record first.
>
> [. . .]
>
> Q. Okay. So what would have happened first, the employer wanted to give a bottle of Reserve rye to all of the employees or the employees broke the OEE record at 55.3 percent?
>
> A. Would have had to broke the record first.

(Appx. 450).[7]  This was exactly the pattern that was followed in distributing the 375 ml bottle of bourbon in November 2022.

The assertion that Woodford Reserve employees would be swayed against unionization by being rewarded for exceeding production standards with a bottle of bourbon whose cost was in-line with or lower than bottles of bourbon that had been routinely gifted to those employees in the past is dubious at best and not borne out by the record.  Despite the emphasis placed on the alleged loss of support for the Union

---

[7]  The ALJ did not question the credibility of Reid.  (Appx. 191).

in October 2022 by both the Board and Intervenor, there was no testimony offered by any Woodford Reserve employee at the hearing in this matter to suggest that the distribution of a bottle of bourbon had any impact on the union organizing campaign or was even considered a significant event.

## **<u>CONCLUSION</u>**

For the reasons set forth above, separately and together, and in Brown-Forman's principal brief, the Petition for Review should be granted, and the Board's Application for Enforcement of its order should be denied.

Respectfully submitted,

SMITH & SMITH ATTORNEYS

<u>/s/ Oliver B. Rutherford</u>
Oliver B. Rutherford
Jacob W. Crouse
400 North, First Trust Centre
200 South Fifth Street
Louisville, Kentucky 40202
(502) 587-0761
obr@smithandsmithattorneys.com
jwc@smithandsmithattorneys.com

*Counsel for Petitioner/Cross-Respondent*
*Brown-Forman Corporation d/b/a*
*Woodford Reserve Distillery*

## CERTIFICATE OF COMPLIANCE

Counsel for Appellant certifies in accordance with Fed. R. App. P. 32(g) that this Petitioner/Cross-Respondent's Reply Brief contains 5,723 words as calculated by the word count function of Microsoft Word.  Further, this brief complies with the typeface and style requirements of Fed. R. App. P. 32(a)(5) and (6).

Dated: August 15, 2025

SMITH & SMITH ATTORNEYS

/s/ Oliver B. Rutherford
Oliver B. Rutherford
Jacob W. Crouse
400 North, First Trust Centre
200 South Fifth Street
Louisville, Kentucky 40202
(502) 587-0761
obr@smithandsmithattorneys.com
jwc@smithandsmithattorneys.com

*Counsel for Petitioner/Cross-Respondent*
*Brown-Forman Corporation d/b/a*
*Woodford Reserve Distillery*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on August 15, 2025, the foregoing was electronically filed

with the Clerk of the Court by using the Sixth Circuit Court of Appeals' ECF system,

which will send notification of such filing to all registered counsel of record.

SMITH & SMITH ATTORNEYS

/s/ Oliver B. Rutherford
Oliver B. Rutherford
Jacob W. Crouse
400 North, First Trust Centre
200 South Fifth Street
Louisville, Kentucky 40202
(502) 587-0761
obr@smithandsmithattorneys.com
jwc@smithandsmithattorneys.com

*Counsel for Petitioner/Cross-Respondent*
*Brown-Forman Corporation d/b/a Woodford*
*Reserve Distillery*